IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
IN ADMIRALTY

| | |
|---|---|
| P & MR of Hatteras, Inc. d/b/a Hatteras Marine Towing,<br>　　　　　Plaintiff<br><br>　　v.<br><br>Charles L. Kennedy, Jr. *in personam*, and the M/V REEL DEAL, Official Number 936049, her engines, tackle, equipment, appurtenances, and gear, *in rem*. | **SALVAGE AWARD** |

### Arbitration Appointment

This matter is pending before the United States District Court, Eastern District of North Carolina, Northern Division. The parties agreed to and the Court referred the matter to arbitration pursuant to the Federal Maritime Arbitration Act, 9 U.S.C. 1, *et. seq*. The parties agreed that generally, and with limited exceptions, the Society of Maritime Arbitrators' SMA Arbitration Rules apply to the arbitration.

The arbitration hearing occurred in Beaufort, North Carolina on Wednesday, November 8, 2017; both parties and their respective counsel were in attendance. The arbitrator received evidence from Plaintiff, Don Davis (Plaintiff's marine surveyor), Defendant, William Robinson (Defendant's marine surveyor), George Hasebe (Defendant's repairman) and many exhibits and well-prepared pre-trial briefs from each party.

Following the hearing, undersigned attended a visit of the Vessel; the Defendant and counsel for Plaintiff were in attendance.

### Factual Summary

Defendant purchased the M/V REEL DEAL on July 25, 2016 for $95,000; the listing price was apparently not less than $100,000;[1] the M/V REEL DEAL, Official Number 963049 is a 1988 45' Hatteras sportfish with Cummins diesel engines ("Vessel"). Defendant has owned several other vessels; the Vessel is the largest vessel he has owned.

---

[1] The discount was allegedly due to a critical finding from a single oil analysis; however, no evidence was presented regarding the inoperability of the engine and in fact, the evidence suggests both engines performed satisfactorily before and after the subject operation.

Defendant sailed the Vessel from Tampa to North Carolina. On the morning of December 31, 2016, Defendant took the Vessel from a dock in Carteret County at about 8:30 a.m. or 9:00 a.m. to Homer Smith Marina in Beaufort to fuel up; after fueling up, around noon, Defendant sailed the Vessel towards Teach's Lair Marina, Cape Hatteras, North Carolina, generally speaking, via the Pamlico Sound. Aboard the Vessel for the voyage to Cape Hatteras with Defendant were a lady friend, an adult male named Alan or Allen with whom Defendant did not have a prior relationship, and some dogs. Defendant's intention as he got close to Cape Hatteras was to follow the North Carolina State Ferry through Barney's Slough to the Marina. At approximately 9:20 p.m., the Vessel and the Ferry W. STANFORD WHITE collided, holing a substantial portion of the starboard side of the Vessel.[2]

Defendant described the collision noting that everyone on board was "terrorized" as the Vessel heeled 45 degrees and items flew about. The Vessel grounded starboard side-to on a sand bar near the #15 marker. Defendant checked his passengers, left the engines and gear running, and turned the bilge pumps on manual. Defendant put his lady friend and dogs upon a life raft he deployed.

Defendant testified that at first he did not know he was aground and instead thought the Vessel was sinking; he testified that had been on the water for 12 hours or so and was "afraid for his life"; he described himself as "too upset to do anything." The United States Coast Guard ("USCG") responded.

The USCG declined to free the Vessel and refused to leave until Plaintiff arrived except to take Defendant's lady friend and dogs to another USCG vessel nearby. The USCG initially gave Plaintiff a pump and Plaintiff testified that he used it to de-water the Vessel. The USCG called TowBoatUS for Defendant. Defendant has a TowBoatUS Unlimited Gold membership.

The United States Coast Guard dispatched Plaintiff at approximately 9:28 p.m. and texted him photographs of the Vessel.

Plaintiff is a professional marine salvor; its principal is Paul Rosell; Plaintiff maintains a fleet of two or more vessels on standby to respond to vessels in duress 24/7; the value of Plaintiff's fleet and equipment is estimated at $175,000; Rosell has been in the emergency vessel response business since the mid-1980s and has operated as a TowBoatUS licensee for 10–15 years. Plaintiff has claimed salvage approximately 15–20 times prior to this instance.

On his way to the Vessel, Plaintiff called a maritime attorney familiar with the law of marine salvage. Plaintiff testified that he was advised to present the Vessel owner with a MARSALV agreement and to check the "Other" box and write in "Pure Salvage." Plaintiff arrived on scene at approximately 10:00 p.m., roughly 30 minutes after receiving the call from the USCG. Plaintiff responded aboard a 26' vessel which

---

[2] None of the instant findings of fact are intended to opine on nor should they be construed to have bearing on the cause of or any fault with respect to the collision.

has been specially modified for emergency vessel response services; the replacement value of the 26' vessel was estimated to be $50,000–60,000.

Plaintiff circled the Vessel to get a visual account of her and found the bottom while on the starboard side of the Vessel. From the texted photographs and/or its visual inspection on site, Plaintiff determined that the fiberglass on the Vessel was fractured both above ***and below*** the waterline. Plaintiff estimated that approximately 80% of the starboard side of the Vessel was stoved in. As an apparent result of the impact of the collision, personal property was askew, and bulkheads were broken loose. The Vessel was positioned so the bow was facing approximately 304 degrees (basically, north/northwest) and the life raft was deployed and floating off the stern.

Plaintiff observed the weather conditions to be as follows: low tide, west/southwest winds at 12–15mph which increased or were predicted to increase to 20–25 mph and move more southwest which Plaintiff concluded was likely to push the Vessel further onto the shoal; the winds, with an incoming tide, were expected to cause the seas to "stand up" in the vicinity of the grounded Vessel; Plaintiff testified he expected conditions would initially worsen then gradually improve as the evening went on; however, the seas remained low; Defendant testified that the weather was calm and seas were less than 1'. The Vessel had approximately 550+/- gallons of fuel aboard. Plaintiff derived and reviewed with the USCG the salvage plan, and the USCG departed.

Plaintiff presented the Defendant with a MARSALV and alleges he told Defendant (which Defendant denies) that this was "clearly a case of salvage" and indicated his TowBoatUS membership did not apply. It is disputed whether the box marked "Other" and "Pure Salvage" was checked and filled out before or after the operation. However, it is not disputed that each party filled out certain portions of the MARSALV and that each initialed next to the "Other" box and signed it prior to the operation. Defendant did not produce at the hearing his copy of the triplicate MARSALV which might further shed light on the timing of the insertion of the words "Pure Salvage." Defendant testified that on two prior occasions when he used his TowBoatUS membership for towing services he had to sign a form to authorize the services and he apparently concluded the MARSALV was the same form he had signed in prior instances. However, the facts and circumstances as well as the printed document suggest a contrary conclusion.

Plaintiff boarded the Vessel, examined the engine room/compartment, galley and v-berth and found the vessel had standing water in certain areas; he testified that he cleared debris in order to access certain areas and also cleared collision debris from clogged bilge pumps so that they could discharge water; however, the Vessel was still taking on water. Plaintiff also used at least one additional pump from his Vessel to assist the de-watering process.

Plaintiff discovered a hose on the exhaust system was ruptured and that the generator was still running. Once Plaintiff instructed Defendant to shut down the generator, the water intake stopped. Plaintiff threw an anchor off the port stern to

ensure the Vessel did not drift further into shallow waters as the tide rose through the early morning hours of darkness. Plaintiff instructed Defendant to run fuel out of the starboard tank in order to lighten her causing her to list to port, with the intent to raise the holed starboard sections of the Vessel. Plaintiff assisted Defendant in deflating the life raft rather than puncturing a hole in it to deflate it (the latter being the intent of Defendant).

The parties spent the early morning hours tidying up the Vessel and further readying her for a tow to safety during daylight hours once weather conditions improved. Both parties took a reasonable period(s) of well-deserved rest ahead of the anticipated daylight operation. At daybreak around 6:30–7:00 a.m., Plaintiff contacted his two sons who Plaintiff testified are licensed Captains and regularly assist in Plaintiff's emergency marine response business. Plaintiff arranged to pick them up by boat.

Upon return to the Vessel at about 7 or 7:30 a.m., the sons boarded the Vessel and Plaintiff used his vessel to blast sand out from underneath the Vessel for about 20 minutes, then promptly towed the Vessel free from the sand bar. Plaintiff towed the Vessel to Scott Boatyard in Buxton about 10–12 miles away which is reportedly the nearest facility capable of hauling the Vessel out of the water. During the tow, some personal property such as a cooler that had been aboard the Vessel was located and recovered from the Sound.

During the tow, it was determined that the Vessel's engines were functional. Defendant objected to going to Scott Boatyard and preferred to proceed to Teach's Lair which apparently does not have the capability of hauling the Vessel.

Undersigned concludes that the continued tow to Scott Boatyard was the safest and most prudent course of action in light of the Vessel's condition.

Due to the configuration of Scott Boatyard, Plaintiff untied the Vessel about 1/4 mile prior to arrival and Defendant successfully navigated her into the slings for haul out. The tow took approximately 2.5 hours and concluded around 11:45 a.m. Plaintiff departed and arrived back at his home port by 1:00 p.m., about 15–16 hours after initially contacted by the USCG.

Plaintiff initially made a marine salvage demand in the amount of $15,000 based on an estimated post-casualty value of $85,000–100,000. The Vessel was thereafter determined to be a constructive total loss.

However, Plaintiff elected to make certain repairs including replacing the exhaust hose from the generator and patching the holed Vessel, and eventually sailing the Vessel to Teach's Lair, and then to Carteret County for further repairs. The Vessel's engines were apparently not damaged and Defendant testified that the Vessel "ran great," that the damage repair was essentially merely cosmetic, and not mechanical in nature.

The parties hotly contest whether or not Defendant notified Plaintiff of his intent to sail prior to doing so. However, it is not contested that Defendant was aware Plaintiff asserted a maritime lien based on alleged salvage services. Text messaging between the parties suggest Defendant informed Plaintiff that he (Defendant) intended to do what he wanted with the Vessel notwithstanding Plaintiff's claim of lien.

The parties further discussed the amount of the claim; apparently Defendant may have suggested he would pay about $5,000 and Defendant raised his claim to $18,000 in order to account for avoiding environmental damage.

Eventually, the Vessel sailed. Plaintiff found the Vessel at Jarrett Bay in Carteret County, initiated this action and caused the Vessel to be arrested.

The parties dispute the post-casualty value of the Vessel. Plaintiff's surveyor who has been in the surveying or relevant industry since approximately 1977 rendered what he testified was a "conservative" estimated post-casualty value of $70,000–80,000 based essentially on a sale of certain components of the Vessel such as engines and electronics. Although the estimates were based, in part, on asking (not actual sales) prices, the witness also relied on information from the re-sale personnel from the yard where the Vessel is located.

Defendant's surveyor, John E. Day, passed away prior to the hearing, however, his report and the testimony of an associate familiar with the investigation, William Robinson, who has been in the marine surveying business since 2011 and became a SAMS accredited surveyor in approximately August 2016 and was merely assisting Mr. Day, was received. Mr. Robinson opined that the post-casualty value was $29,750 based on BUC "restorable condition" value ($35,900) less 15% depreciation.

Plaintiff's counsel effectively cross-examined Mr. Robinson to reveal that BUC values apparently do not account for vessels in "un-restorable" condition and that the amount of depreciation applied was subjective. Defendant presented no evidence of re-sale value of the Vessel's components.

There was testimony that an offer of $25,000 was given for the Vessel after the Vessel was arrested and in such circumstances that she was likely to bring a less than fair market value as a whole for purposes of private sale at that time; undersigned is not significantly swayed about the value based on the offer.

At the request of the parties, undersigned visited the Vessel after received all other evidence and it appeared that the repairs to the hull fractures were extensive and likely included some below the waterline.

### Legal Issues—Is It a Salvage and If So, Is It Contractual Salvage or Pure Salvage?

It is well-established that the three elements to a marine salvage are: 1) voluntariness, 2) marine peril, and 3) success. If the elements are met, the next issue

to determine is the amount of an appropriate award using the *Blackwall* factors and/or those factors espoused in the Salvage Convention of 1989 (a primary difference between the two being arguably that the more modern SALCON 89 expressly accounts for environmental disaster avoidance).

This arbitrator finds that the elements of marine salvage are met. Taking them in reverse order:

1) <u>Voluntariness</u>—Defendant contends that his TowBoatUS membership obligated Plaintiff to perform the operation because the vessel was soft aground in sand; however, the terms of the membership clearly exclude salvage and operations of the unique and unfortunate sort and extent then facing the Vessel. The arbitrator finds that the operation was not covered by the TowBoatUS membership and was voluntary.

2) <u>Marine Peril</u>—Under the instant circumstances (including but not limited to: the Vessel was holed following a collision with a State Ferry and fractures in the hull were identified above and below the waterline, she was grounded at low tide in darkness on New Year's Eve, the Coast Guard declined to leave except to take passengers to safety until Plaintiff arrived, Defendant was unable to source the water intake), it cannot seriously be contested that the Vessel was not "in peril" as that term is used in the marine salvage context and during closing argument, Defendant's counsel conceded the peril element.

3) <u>Success</u>—There was clearly success and Defendant does not allege that Plaintiff damaged the Vessel nor that he was negligent in conducting the operation.

Trickier, however, is the issue of whether the operation was one of pure salvage or contractual salvage. Pure salvage is generally thought to be that performed without an agreement as to compensation while contractual salvage is that performed pursuant to an agreement of the parties as to compensation. Generally, the completion of a MARSALV puts the operation into the category of contractual salvage, the primary implication being that additional terms (generally favorable to the salvor) are included such as a contractual obligation for the salvor's attorneys' fees.

Here, the question becomes what is the significance and impact of the selection of the "Other" box followed by the words "Pure Salvage" on the MARSALV. In other words, if the parties had a meeting of the minds, they, in essence, agree to pure salvage.

The parties testified that neither understood the significance of the words "Pure Salvage" being written into the MARSALV. Plaintiff had not written "Pure Salvage" into prior agreements and the parties did not discuss its consequence. Therefore, it is hard to conclude that there was any kind of meaningful meeting of the minds which lends itself to labelling this a pure salvage rather than contractual salvage. As Plaintiff articulates in his pre-trial brief at page 11 "[m]any of the same factors that will void a contract under common law such as . . . mutual mistake . . . will also void a salvage contract" (citation omitted). However, even if the parties understood the phrase "Pure

Case 2:17-cv-00013-FL   Document 34-1   Filed 12/01/17   Page 6 of 9
Page **6** of **9**

Salvage," when a handwritten provision is inserted into a contract, that generally trumps the printed term, *see* e.g., – Matter of Arbitration between Mitsubishi Corp of Tokyo and Conkary, 92 CV 8587 1996 WL 254994 (S.D.N.Y. June 30, 1993) (unpublished), Ocean Range Transport Co. v. Hess Oil Virgin Islands Corp., 598 F. Supp. 46 D.V.I 1984): both citing Restatement (Second) of Contracts, §203, Comment f; see also BaywatchRI *Marine Towing v. M/V DEVOCEAN,* BoatUS Salvage Award Case No. 09-0116 (attached) (where individual for vessel's interest wrote on a "Standard Form Salvage Contract": "For Reasonable Towing Fee Only" and initiated, Panel concluded that because the "contract is for reasonable towing fees only [Plaintiff] cannot meet its burden of proving salvage services to that vessel.") (citations omitted). Clearly, some weight is to be given to handwritten terms and "pure salvage" is a legal term of art, whether known to the parties at the time of the operations, or as here, not. Here, because the handwritten contractual term is "Pure Salvage" and if there were no writing or paper agreement or no meeting of the minds, the operation would be one of pure salvage, the arbitrator concludes this operation is one for pure salvage and an award should be determined accordingly.

## Amount of the Award

The arbitrator considered the Blackwall (77U.S. [10 Wall] 1 (1869) and SALCON 1989 factors and summarizes their application as follows:

(a) the salved value of the vessel and other property saved—the post-casualty value of the Vessel was likely $70,000–$80,000; in this unique instance, the arbitrator prefers not to apply the BUC/depreciation value analysis;

(b) the skill and efforts of the salvors in preventing or minimizing damage to the environment—a level of danger to the environment existed and is noted as a result of the quantity of fuel aboard (notably, some fuel will be aboard almost all vessels at sea), however, there was not a serious risk of a spill during the operation

(c) the measure of success obtained by the salvor—high if not 100%

(d) the nature and degree of the danger from which the property was rescued— Plaintiff estimated 3/10; the weather was calm to moderate; however, Plaintiff's decision to stabilize the Vessel and wait for daylight and calmer conditions is noted;

(e) the skill, efforts and energy of the salvor in salving the vessel, other property and life—Plaintiff estimated 3/10; Plaintiff underestimates its skills in sourcing and curing the leak, stabilizing the Vessel and towing her (in a list) to the most appropriate facility;

(f) the labor, time used and expenses and losses incurred by the salvors—the duration of the operation is detailed above; Plaintiff estimated its hourly rate to be $10,300; in comparing his membership and non-membership towing rates during daylight and dark hours, the estimate is not grossly disproportionate;

(g) the risk of liability, exposure to danger and other risks run by the salvors or their equipment and the value of such equipment—existent;

(h) the promptness of the services rendered—prompt; notably the call came in from the USCG on New Year's Eve after dark;
(i) the availability and use of vessels or other equipment intended for salvage operations—Plaintiff's capabilities are described above; and,
(j) the state of readiness and efficiency of the salvor's equipment and the value thereof—the day and timing of Plaintiff's response speaks for itself.

An equitable uplift is warranted as a result of the Plaintiff being a professional salvor who performed this operation through New Year's Eve during darkness and into the New Year.

Undersigned has reviewed many other salvage awards and those cited by each of the parties.

Plaintiff seeks an award in excess of $18,000. Defendant advocates for an award of less than $3,000.

An award of **$14,250** is adequate and not more than necessary as an appropriate salvage award in this instance.

Plaintiff's request for attorneys' fees is denied. The general rule in admiralty is that each party must bear his own attorneys' fees, absent (a) a statutory provision, or (b) a contractual provision to the contrary, or (c) bad faith. *Vaughan v. Atkinson*, 369 U.S. 527 (1962). No statute requires attorneys' fees in this instance; if anything, the case law affords this arbitrator discretion to award or decline attorneys' fees for a salvage claim. The MARSALV containing a handwritten term "Pure Salvage," whether (1) invoking pure salvage by contract, or (2) failing for lack of a meeting of the minds, dictates a pure salvage. Further, the arbitrator finds that the Plaintiff's conduct does not amount to bad faith; Plaintiff's negotiation tactic of increasing his demand by $3,000 might be of some concern, however, the demand was not grossly unfair in light of the circumstances, Defendant did not seek a bond hearing and Defendant's alleged conduct in the negotiation process (mentioned in the findings of fact; further, the arbitrator recalls conflicting testimony and some concern about Defendant allegedly removing electronics and furniture from the Vessel prior to her arrest) equals if not outweighs that of the Plaintiff. This arbitrator determines that it is most equitable to NOT award attorneys' fees to either party in this dispute.

Costs plus pre-judgment interest at the legal rate (8%) are appropriate and are awarded to Plaintiff.

The arbitration agreement, pre-trial briefs of the parties and all exhibits received are attached along with the arbitrator's invoice for services.

Respectfully submitted with sincere thanks to the parties, their counsel, and the Court this __1__ day of December 2017.

_____
Jason R. Harris
N.C. State Bar No.: 27876
2419 Market Street
Wilmington, North Carolina 28403
Telephone: (910) 763-3404
Facsimile: (910) 763-0080
*Arbitrator*